IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PATRICK STRICKLER,           §
                             §
     Plaintiff,              §
                             §
v.                           §     CIVIL ACTION NO. H-16-1256
                             §
HOBBY LOBBY STORES, INC.,    §
                             §
     Defendant.              §

## MEMORANDUM OPINION

Pending before the court[1] is Defendant's Motion for Summary Judgment (Doc. 50).  The court has considered the motion, Plaintiff's response, and the applicable law.  For the reasons set forth below, the court **GRANTS** Defendant's motion.

## I.  Case Background

Plaintiff filed this action against his former employer, alleging that Defendant violated Title VII of the Civil Rights Act of 1964[2] ("Title VII") by retaliating against Plaintiff for reporting a store manager's gender discrimination and sexual harassment of female employees.

### A.  Factual Overview

The documents and communications in this case, supplemented by Plaintiff's testimony, provide a solid overview of the dispute

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  See Doc. 35, Ord. Dated May 9, 2017.

[2]    See 42 U.S.C. §§ 2000e-2000e-17.

between Plaintiff and Defendant.[3]

## 1. **Documentary Evidence**

On December 22, 2014, Plaintiff began working as a co-manager for Defendant at Store #110.[4]  The manager at the store was Glenn Lucadou ("Lucadou"), and the district manager (also "DM") was Lynn Siecko ("Siecko").[5]  The regional vice president over Store #110 was Jeff Myers ("Myers").[6]

Defendant's Employee Handbook at the time included a section on attendance that stated the following attendance policy, in part:

> Employees are expected to report to work on time as scheduled.  Failure to do so constitutes a tardy[,] which is defined as clocking in, reporting, and/or returning to work, past the scheduled time.
>
> If an employee [(also "EE")] is going to be tardy or absent from any scheduled work, he/she must speak directly with his/her supervisor (emailing and texting are not acceptable) before, or no later than thirty (30) minutes after, the beginning of his/her shift, and explain the reason for the tardy or absence.  Failure of an employee to speak directly with his/her supervisor as required above will constitute a No-Call/No-Show absence. It is the employee's responsibility to ensure that proper notification is given. . . .

---

[3]     Although the court quotes the documents and communications exactly as they appear in the record as much as possible without grammatical modifications, the court corrects misspellings and punctuation as necessary for clarity and identifies the individuals mentioned by surname for consistency with the remainder of the opinion.

[4]     See Doc. 50-17, Ex. 17 to Def.'s Mot. for Summ. J., Charge of Discrimination Dated Oct. 15, 2015; Doc. 53-1, Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp."), Letter from Michael Robertson to Pl. Dated Dec. 15, 2014.

[5]     Doc. 53-1, Ex. 1 to Pl.'s Resp., Letter from Michael Robertson to Pl. Dated Dec. 15, 2014.

[6]     See Doc. 53-11, Ex. 11 to Pl.'s Resp., Incident Report.

> Tardies and/or excessive absences may result in
> disciplinary action, up to and including termination of
> employment and/or may have an adverse effect on
> evaluation and promotional considerations.[7]

The Employee Handbook defined No-Call/No-Show as "fail[ing] to report to work as scheduled and fail[ing] to speak directly with his/her supervisor (emailing and texting are not acceptable) before, or no later than thirty (30) minutes after, the beginning of his/her shift."[8]   A No-Call/No-Show absence "constitute[d] grounds for disciplinary action, up to and including termination of employment."[9]

Defendant's Policy Against Inappropriate Conduct stated:

> The Company prohibits inappropriate conduct.
> Inappropriate conduct means comments or actions that are
> inappropriate for the workplace, disrupt and/or interfere
> with work performance[] or negatively or stereotypically
> relate to an employee's race, color, religion, gender,
> pregnancy, national origin, age, disability, genetic
> information, Veteran's status, or any other status,
> condition or characteristic protected by law.
> Inappropriate conduct includes unlawful harassment and
> discrimination, as well as unlawful sexual harassment as
> defined below.

### Harassment and Discrimination

> The Company is committed to maintaining a work
> environment free from unlawful harassment and
> discrimination as well as other inappropriate actions and
> comments that may not rise to the level of unlawful
> harassment or discrimination.   The Company prohibits

---

[7]     Doc. 50-5, Ex. 5 to Def.'s Mot. for Summ. J., Employee Handbook p. 14.

[8]     Id.

[9]     Id.

harassment and discrimination on the basis of race, color, religion, gender, pregnancy, national origin, age, disability, Veteran's status, or other status, conditions, or characteristics protected by law. The Company also prohibits inappropriate sexual conduct which is a form of inappropriate conduct and includes unwelcome sexual advances, requests for sexual favors, and other verbal, physical conduct of a sexual nature where:

1.   Submission to such conduct is either an express or implied term or condition of an individual's employment;

2.   Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting that individual; or

3.   Such conduct creates a hostile or offensive working environment.[10]

The Employee Handbook outlined a process that a witnessing employee was required to report "inappropriate conduct," allowing the employee the make a report to his/her supervisor, any other appropriate member of management, or the human resources department.[11]  The policy further stated:

The Company will promptly and thoroughly investigate all complaints of inappropriate conduct that appear to violate the Company's Policy Against Inappropriate Conduct.  If management makes a determination that an employee has violated the Company's Policy Against Inappropriate Conduct, it will take reasonably necessary steps to ensure the inappropriate conduct does not occur again.  The Company prohibits retaliation against any employee who reports inappropriate conduct.[12]

About three months into Plaintiff's employment, Lucadou

---

[10]   Id. p. 28.

[11]   Id.

[12]   Id.

4

completed an employee journal entry reflecting that he spoke with Plaintiff "about the importance of zoning."[13] According to the journal entry, Lucadou explained that, before leaving, Plaintiff should walk the entire store to ensure "the zone is correct."[14] Lucadou provided details as to what was expected and showed Plaintiff areas that needed improvements.[15] In a second entry of the same date, Lucadou recorded that he also addressed company policy and procedures regarding "the weekly checkers test."[16] Lucadou signed both entries on the line for "Supervisor Signature."[17] On the opposite side of the paper, Lucadou wrote:

> After discussing this with [Plaintiff,] I asked him to initial the journal. He then stood up and said he was not signing anything[,] then turned around and left. I called him back[,] and he did not respond. I then called [Siecko] and informed him of the situation. He ask[ed] me to call [Plaintiff] to see if he was quit[t]ing[,] and[,] if so[,] he needed to bring back the store keys. I called [Plaintiff,] and he called back and said he would be here in the morning. [Siecko] told me to let [Plaintiff] know that the journal would go in his file.[18]

On a raise evaluation conducted on March 22, 2015, Plaintiff received a rating at the low end of the "good" range, the third

---

[13]   Doc. 50-6, Ex. 6 to Def.'s Mot. for Summ. J., Emp. Journal Entry Dated Feb. 12, 2015.

[14]   Id.

[15]   See id.

[16]   Id.

[17]   Id.

[18]   Id.

highest rating on the scale.[19]

On May 21, 2015, Plaintiff submitted a vacation request for four days in June; Siecko approved the request on May 25, 2015.[20] On May 26, 2015, Siecko issued Plaintiff a written warning for violation of company policy, which stated:

> Poor job performance & behavior that does not meet management expectations. . . .
>
> Store not properly zoned, clearance wall not zoned in [illegible] area & seasonal flex sides not recovered, after closing shift on Friday May 22nd.
>
> Failure to comply with policies in the future could lead to further disciplinary action and up to termination.[21]

The warning stated that termination would be the consequence if an incident should occur again and noted that Plaintiff refused to sign the warning.[22] Siecko signed the form on the line provided for "Supervisor Signature."[23]

On July 2, 2015, Plaintiff telephoned human resources (also "HR") and spoke with Kelly Dalrymple ("Dalrymple"), HR specialist.[24] Dalrymple's notes stated that Plaintiff reported that he felt

---

[19]    Doc. 53-7, Ex. 7 to Pl.'s Resp., Co-Manager Raise Evaluation.

[20]    See Doc. 50-16, Ex. 16 to Def.'s Mot. for Summ. J., Vacation Req. Dated May 25, 2015.

[21]    Doc. 50-7, Ex. 7 to Def.'s Mot. for Summ. J., Emp. Written Warning.

[22]    See id.

[23]    See id.

[24]    See Doc. 53-11, Ex. 11 to Pl.'s Resp., Incident Report.

harassed by Lucadou and Siecko.[25]  The report further documented the following statements by Plaintiff:

- Lucadou "yelled at [Plaintiff] and called him 'slow.'"

- Lucadou "wrote [Plaintiff] up for not walking the store one time when he was sick, in February or March."

- Lucadou "will constantly lie right to your face."

- Lucadou "often makes EE cry."

- Plaintiff had heard that Lucadou and Siecko were "close friends" and that Lucadou was telling Siecko things about Plaintiff that were not "entirely true."

- Siecko "sat [Plaintiff] down to discuss store conditions" and stated "that he thought [Plaintiff] was lazy."

- Lucadou "speaks badly about [Plaintiff,] the DM and associates."

- Plaintiff was "recently" written up during which occasion Siecko "made a comment about how he hopes he finds another job soon."

Dalrymple asked Plaintiff to send her a statement.[26]

In the evening of July 2, 2015, Plaintiff emailed Dalrymple on the subject "Incidents at Hobby Lobby #110."[27]  The email stated:

When starting at store #110, my manager Glenn Lucadou seemed very nice and knowledgeable.  8 days passed when he approached me and told me I wasn't getting things done quickly enough.  I wasn't sure what things he was talking about, as he never gave me specific things to do.  I spent most of my time in seasonal with an assistant by the name of Tanrace Moshay [("Moshay")], trying to find

---

[25]    See id.

[26]    See id.

[27]    The email is extremely long; yet, it is necessary to quote it in its entirety because of its significance with regard to resolving the issues raised on summary judgment.

out what we were supposed to be doing. [Moshay] wasn't very forthcoming with information. I asked him if I did anything wrong, and he told me he was tired of training all the Co-Managers that came through the store. He told me he trained the last 3[] and that [Lucadou] tends to sit in the office most of the time[;] three days later[,] after being on the job for 12 days, [Lucadou] pulls me aside in the stockroom[] and asks me in a raised voice what my problem was. He asked why things were not moving faster[.] I was still unaware of what things he was talking about, as he had never worked with me on the floor. I told him that the only thing he had done was give me the seasonal book and tell me to work on it any[]way you think is best. He then states sarcastically[,] "[A]re you slow? [M]aybe I need to move slower with you." I told him that all I wanted was him to train me.

About three weeks go by. [Lucadou] became ill[;] I believe he had the flu. For two nights in a row[,] I told him to go home and I would handle the store. This was on one day shift and one night shift. He took some days off and was out for about 5 days. I had become ill when he was out. I had the flu. The day before he returned[,] I had high fever and was very ill. I didn't walk the store that night. The next day he saw me[,] he became rude and sarcastic. He said my store doesn't look like this[] and asked if I had walked the store. I told him about my illness and he said why didn't I call him. I told him I didn't think it was right to call him in on his last day off. I have always gone into work when I was sick. Later, he called in all the department heads that were there[] to his office. He spoke with them one at a time, complaining to each of them. He then called me in and told me he had written me up because of the way the store looked. I was still slightly ill and couldn't believe he was doing this. I refused to sign the write up. He said OK, and it was past time for me to leave (5:10pm), so I said see you tomorrow, and left. While in my car I get a phone message. Upon arriving home[,] I looked and saw it was [Lucadou]. He said[,] "I spoke to [Siecko,] and I need you to call me,["] so I did. He asked me if I was coming in tomorrow, and I told him I already said I would see you tomorrow. I forgot he was off the next day. He showed up the next morning, on his day off. He calls me to the office around 11am, telling me we need to get along to run the store together. I started to become bothered by what I was seeing.

About 5/19/15, I was called to the manager[']s office again. [Lucadou] confronts me asking if I was looking for another job. He told me that other associates have been telling him that[] and that I was going on numerous interviews. He said it was bad for the morale of the store. I had talked one week earlier with [Moshay] about a job my father-in-law was telling me about. He was trying to get me to go to his old company. I didn't plan on leaving or go on interviews. I let him know that I was doing what the rumors were saying [sic].

Later, at the end of May, we had our stock test on a Saturday. I closed on the Friday before[] and was off for the weekend. The next Monday, my DM [Siecko] was in the store early. I was called to the office. [Siecko] was there for another write-up. As I found out, many (untrue) things were being relayed to him by [Lucadou]. [Siecko] started off saying [Lucadou] expressed some concerns about the store. He told me he was in the store on Saturday, and the store didn't look bad but didn't look as good as it should. He said a few items could have been hung in the seasonal aisles. He told me that [Lucadou] had told [Siecko] about some previous incidents. He said that he thought I might be lazy because of a question he asked me my first month on the job, but he was giving me the benefit of the doubt. We were doing inventory prep at another store, and I had been going up and down ladders for most of the day. [Siecko] asked me how I was doing, and I told him I was good, just a little tired from going up and down the ladders. I would think this was normal for anyone. [Siecko] then states that associates say when [Lucadou] leaves, I put my blue tooth in my ear and walk around. He said he has never seen this so he didn't know. I can tell you [Lucadou] has never seen this[] because I don't do it. But just another rumor [Lucadou] call [sic] [Siecko] about. Next he tells me he thinks [I]'m very unprofessional for never answering my phone[] when [Lucadou] calls. This is when [I]'m off work. The prior week [Moshay] told me that [Lucadou] had tried to get in touch with me and told him he said he could never get in touch with me. Concerned, I went immediately to see [Lucadou]. I asked if he tried to get in touch with me yesterday. He told me yes[] and that he could never get in touch with me. I told him that my phone goes into my room on the charger when I get home. And[,] if he needed me[,] to call my home phone, and gave him the number. What is interesting is that my phone will show if someone

tries to call me[,] and I had never seen his number or name on it.  I tried to respond to [Siecko], but he just put his hand out for me to be quiet and listen.  Next, [Siecko] starts talking about me looking for a job.  Another rumor that [Lucadou] told him.  It was like children telling on each other.  In my 35 years of retail, I had never seen something like this.  Finally at the end I spoke to [Siecko].  I told him I am a hard worker and always have been.  I told him that [Lucadou] had never worked side by side with me on the floor.  He stated that he didn't care, as long as [Lucadou] got things done.  He then says that [Lucadou] has promoted 3 Co-Manager[s] from this store. [Siecko] asks me to sign the write-up, and I refused.  He tells me this is just another example of how you don't take responsibility for you[r] actions.  And then his final words to me were "I hope you find a new job soon!"

There have been many times [Lucadou] has done things to divide the store.  Just last week he called me in seasonal and asked m[e] how thing were going[.] I told him "good and we are getting it done[."]  I left seasonal and came back a few minutes later. [Moshay] comes up to me and says "so we[']re moving slow[,] and we are behind[."] I asked[,] what?  He told me that Claudine said [Lucadou] just told her that and to come help us.  He is always saying another associate said this or that about things.  While moving counters with other Co-Managers in our store, one collapses in the middle and some glass breaks. [Lucadou] gets upset and asked me what happened.  I told him it collapsed.  He tells me that Bob (from Tomball) said we were being careless and moving to[o] fast.  I asked Bob if [Lucadou] had talked to him, and he said no.  You can't tell if he is ever[] telling you the truth or not.  I have seen [Lucadou] take many of our female associates into the office and shut the door.  Only to see them come out later crying [sic].  I'm asked who is closing all the time, and[,] when they hear [Lucadou], they sigh.  After our last [Myers] visit, [Lucadou] called for a meeting in the break room.  He tells everyone the store visit was great, but the floral [department] was a mess.  I don't think him calling out our floral [department] head in front of everyone was appropriate.  I have heard numerous stories [from] many associates[] but will not mention them.  If someone would talk privately to the associates, they might speak up.  Most are afraid for the[ir] jobs. Kathleen McDonald told me [Lucadou] was asking her questions about me.  Asking

what I was doing at night.  This is not right.

[Lucadou] also wants his Co-Managers in at 7:30am.  And
when it comes to leaving on time, you can ony do that if
the projects are completed.  It doesn't matter to him
what corporate says their hours should be.

I have been very depressed for the last two months about
all that has been going on.  I am requesting to move to
a different location.  I am positive that I don't have a
fair chance of moving up in this district.  I have heard
that [Lucadou] and [Siecko] are close, and[,] after all
this, I believe it.  If you could help me move to another
district and store[,] I will be thankful.  Store #127 or
Store #387 would be my choices.[28]

On the following Monday, Dalrymple replied to Plaintiff's

email, stating that she would "forward it to the appropriate member

of management" for review.[29]  Plaintiff sent another email on July

10, 2015, which supplemented his prior email with the following:

While working this past Friday, I checked in on the Frame
Shop.  Jennifer Herring was working this morning.  She
told me she was upset because Glenn Lucadou denied her
vacation[] because it was right after another frame shop
employee[']s vacation.  She had to cancel reservations.
Then she told me that [Lucadou] was always belittling
her.  She felt like her job was being threatened.  Then
she told me that [Lucadou] had grabbed her head and shook
it saying[,] "[H]ello, is there anything in there[.]" She
said she was livid and was about to defend herself.  That
is why I am reporting this to you.  A lot of employees in
our store have felt threatened by [Lucadou].  I am
speaking up for them, as they are afraid to.[30]

On July 13, 2015, Dalrymple spoke with Myers, who stated that

_____

[28]    Doc. 50-8, Ex. 8 to Def.'s Mot. for Summ. J., Email from Pl. to
Dalrymple Dated July 2, 2015.

[29]    Doc. 50-8, Ex. 8 to Def.'s Mot. for Summ. J., Email from Dalrymple
to Pl. Dated July 6, 2015.

[30]    Doc. 50-8, Ex. 8 to Def.'s Mot. for Summ. J., Email from Pl. to
Dalrymple Dated July 10, 2015.

Plaintiff was on personal leave for a medical issue.[31]  Myers also stated that he was planning to begin interviewing employees at Plaintiff's store later that week.[32]  Myers conducted an investigation into Plaintiff's complaints.[33]  An Involved Parties Worksheet that was completed as part of Myers' investigation identified Lucadou and Plaintiff each as "Accused."[34]  In addition to interviewing Lucadou and Plaintiff, Myers spoke with thirteen employees, eleven of whom were women.[35]

On July 24, 2015, Myers sent Dalrymple an email relaying the results of the investigation.[36]  The email stated:

> I conducted an investigation of the complaint from [Plaintiff] . . . . I interviewed EEs at the store on July 14 and July 17.  I interviewed [Plaintiff] and also [Lucadou] on July 21.  That same day they each were issued a written warning . . . .
>
> The investigation revealed that some of [Plaintiff's] complaint has merit, and some does not.  There were things that came up that also had to be addressed with [Plaintiff].
>
> [Lucadou] is too rough and aggressive at times with the EEs.  7 of the 13 EEs interviewed said they have seen or have been personally brought to tears by the way he has spoken to them; this is addressed in his written warning.

---

[31]    Doc. 53-11, Ex. 11 to Pl.'s Resp., Incident Report.

[32]    See id.

[33]    See id.; Doc. 53-13, Ex. 13 to Pl.'s Resp., Email from Myers to Dalrymple Dated July 24, 2015.

[34]    Doc. 53-13, Ex. 13 to Pl.'s Resp., Involved Parties Worksheet.

[35]    See id.

[36]    See Doc. 50-9, Ex. 9 to Def.'s Mot. for Summ. J., Email from Myers to Dalrymple Dated July 24, 2015.

However, not 1 EE agrees that they've ever felt threatened by [Lucadou]. Most EEs say they do have respect for him and recognize he has high standards. Many also say that there is very good teamwork amongst the EEs due to [Lucadou's] leadership. No one has heard him yell except for one time in the stockroom regarding moving a fan that was running. Regarding "things to divide the store[,"] one EE (Sandra, [bookkeeper]) recalls him asking her about saying something that she had never said and felt maybe he was trying to stir the pot; another Kathleen (needleart) said he has asked her how what [sic] the [co-manager] or [assistants] do when he's not there. Regarding Jennifer H (framing) being denied vacation and canceling reservations, she said that happened[,] but it was not a big issue. She did say that [Lucadou] one time touched her head and asked if anything was in there; I cautioned [Lucadou] never to touch EEs. The issue of sarcasm and rudeness was reported during most of the interviews; this is included in his written warning. Only 2 EEs said that [Lucadou] has called out someone by name in a meeting. 5 EEs said he talks about issues but doesn't name names.

When I interviewed [Plaintiff][,] I had my [assistant] Nina Flores go to the store as a witness on July 21. I first listened to him recount his concerns. During that time[,] I showed him the written warning that [Siecko] had issued on May 26, 2015, since he said he never actually read it. I clarified that the topic of using a bluetooth and asking about a job search were not what the warning was about. I let him know that[,] in researching the part of his complaint about EEs sighing when they find out [Lucadou] is closing, that EEs said [Lucadou] is very structured and involved in the recovery after closing and insists it is finished properly; but about [Plaintiff] they said he is disengaged and does not check their work. I told [Plaintiff] that this validates [Siecko's] written warning about poor recovery. I told [Plaintiff] that some of the concerns that he reported were going to be addressed with [Lucadou] and thanked him for bringing it to someone's attention. But I also covered things that came up about [Plaintiff]: slow or no response to calls especially when [Lucadou] is gone; telling EEs not to call him because he's stressed out; being a buddy [versus] a boss toward EEs; hiding out in the EE lounge. In the written warning I gave him[,] I listed how he criticizes [Lucadou] to hourly EEs and also the reports of [Plaintiff] using profanity.

. . . .

When [Siecko] and I talk[,] a decision will be made at that time as to transferring [Plaintiff] or not. I did not find any reason that [Plaintiff] cannot succeed in [Siecko's] area just as well as another. [Plaintiff] and [Lucadou] do seem to have a tension built up though; for that reason[,] we will consider a move for [Plaintiff].[37]

After the investigation, Myers counseled Lucadou and Plaintiff.[38] Lucadou's coaching session focused on his pushing employees to tears when correcting them, his late posting of the schedule, and his being rude and sarcastic at times.[39]

On Plaintiff's Manager Coaching/Counseling Acknowledgment Form, Myers noted the contents of his discussion with Plaintiff, as follows:

In the course of an investigation conducted at [Store #] 110 on 7-14-15 & 7-17-15[,] it was found/reported by a number of hourly EE's of this store:
➜   [Plaintiff] has complained about his boss [Lucadou] to store EE's on numerous occasions.
➜   [Plaintiff] has used profanity on the job.[40]

The form stated that Plaintiff must do the following to improve:

➜   If there is a concern [with] boss[,] then tell someone above you. At all times show support for the boss in front of your subordinates.

---

[37]   Id.

[38]   Doc. 50-11, Ex. 11 to Def.'s Mot. for Summ. J., Pl.'s Manager Coaching/Counseling Acknowledgment Form Dated July 21, 2015; Doc. 53-14, Ex. 14 to Pl.'s Resp., Lucadou's Manager Coaching/Couseling Acknowledgment Form Dated July 21, 2015.

[39]   See Doc. 53-14, Ex. 14 to Pl.'s Resp., Lucadou's Manager Coaching/Couseling Acknowledgment Form Dated July 21, 2015.

[40]   Doc. 50-11, Ex. 11 to Def.'s Mot. for Summ. J., Pl.'s Manager Coaching/Counseling Acknowledgment Form Dated July 21, 2015.

14

➡    Refrain 100% from any profanity at Hobby Lobby[.][41]

Meyers marked the box that stated any "[f]urther action up to and including termination of employment" would be the consequence of Plaintiff's failure to improve.[42]  Myers signed the form on the line for "Supervisor Signature," and Plaintiff marked the box indicating agreement with the coaching/counseling and signed the form.[43]

Myers and Siecko decided to transfer Plaintiff to another store within Siecko's district.[44]  Siecko spoke with Plaintiff on August 4, 2015, to relay the the results of the investigation and to inform him of the decision to transfer him to another store.[45]  Siecko's notes from that meeting stated, in part:

> I told him I was made aware that he felt he could not work with [Lucadou] because he was harsh and to[o] demanding. . . .
>
> I also covered with [Plaintiff] that the request by [Lucadou] to come to work at 7:30 was not unreasonable. I explained that I considered it good professionalism to be at work before our employees come in at [8:00].  And as ne[ce]ssary some times [sic] this position could require you to stay past 5 pm when needed.
>
> I asked [Plaintiff] how he felt about this[,] and he said nothing[.] Just shook his head.  I asked him[, "]You don't seem to be satisfied?["] He said he was ok just worried about something not work related.  I ask[ed] him

---

[41]    Id.

[42]    Id.

[43]    See id.

[44]    See Doc. 53-11, Ex. 11 to Pl.'s Resp., Incident Report; Doc. 53-12, Ex. 12 to Pl.'s Resp., Email from Myers to Dalrymple Dated Aug. 4, 2015.

[45]    See Doc. 53-15, Ex. 15 to Pl.'s Resp., Supervisor Notes.

if there was anything he [sic] like to discuss he could
do so [sic].  He shook his head no and grinned.

I also covered with [Plaintiff] 3 days he was late to
work during the week of July 18-24 and July 29-Aug 1[.]
I told him he was not being disciplined for these times
but going forward I would have to address any t[ar]dy
issues with him.[46]

On September 3, 2015, Siecko counseled Plaintiff for failing

to notify Siecko when Plaintiff was absent from work on September

2, 2015.[47]  Siecko noted on the form that "All Co[-] Managers are

to notify district manager by phone call if there is a change in

schedule, late to work, leaving early or abs[]ences."[48]  Siecko

marked the box indicating that failure to improve would result in

"[f]urther action up to and including termination of employment"

and additionally handwrote, "Any further violation of policy will

result in termination."[49]  Plaintiff marked boxes for both

"agreement" and "disagreement" and explained his disagreement as

follows:

After leaving work, being seriously ill, and mak[ing] it
home, I texted [Siecko] and was in bed until the next
day.  I had a major drug interaction[] and was very ill.
I did fail to call [Siecko], but I was able to text him.
I agree with the phone policy of not calling him.[50]

---

[46]     Id.

[47]     See Doc. 50-12, Ex. 12 to Def.'s Mot. for Summ. J., Pl.'s Manager
Coaching/Counseling Acknowledgment Dated Sept. 3, 2015.

[48]     Id.

[49]     Id.

[50]     Id.

Plaintiff signed the form as employee, and Siecko signed it as supervisor.[51]

On September 8, 2015, Siecko terminated Plaintiff.[52] The Manager Coaching/Counseling Acknowledgment Form indicated that the termination was based on Plaintiff's violation of company policy and stated: "In subordination, refused to comply with supervisor[']s instructions. [Plaintiff] failed to submit request for a vacation day off for Friday[,] Sept. 04, 2015. This vacation day off was not approved."[53] Siecko listed three previous occasions on which Plaintiff received coaching or a warning: (1) on May 26, 2015, for poor job performance; (2) on July 21, 2015, for violation of company policy; and (3) on September 3, 2015, for failure to notify DM of absence.[54] Plaintiff refused to sign the form.[55] The notice of personnel change listed "Insubordination" as the reason for termination.[56]

Debbie Cain ("Cain"), manager of Store #91, served as a witness and memorialized in a signed statement Plaintiff's answer to Siecko's query to Plaintiff why he had not submitted a request

---

[51] See id.

[52] See Doc. 50-13, Ex. 13 to Def.'s Mot. for Summ. J., Pl.'s Manager Coaching/Counseling Acknowledgment Dated Sept. 8, 2015.

[53] Id.

[54] See id.

[55] See id.

[56] Doc. 53-8, Ex. 8 to Def.'s Mot. for Summ. J., Personnel Change Notice.

for the vacation day.[57]  Cain wrote that Plaintiff said he had

forgotten to do so.[58]

On the morning of September 9, 2015, Plaintiff emailed

Dalrymple, stating:

> After the incident at store #110, I asked to be moved out
> of [Siecko's] district.  He had already threatened me by
> telling me to find a new job real soon.  On 9/1/15, I
> called my supervisor [Cain] and let her know I was unable
> to come to work that day.  I had been in a car accident
> and had been up all night with muscle spasms.  I then
> called [Siecko] and told him the same thing.  My doctor
> had given me 2 new medications on that day.  While
> driving to work on 9/2, I felt very dizzy, and my arms
> and legs[] and throat were going numb, and it was hard to
> talk.  I made it to work and could not walk straight or
> function.  I told [Cain], my supervisor, that I had to
> leave.  I told her about what was happening to me, and
> let her know I would be lying down in my truck before
> attempting to drive home.  After leaving and finally
> making it home, I sat down and passed out.  When I woke,
> I sent [Siecko] a text telling him what had happened.  He
> came to the store a few days later and wrote me up for
> not reporting to him why I was absent.  He even told me
> that he received my text.  This is very untrue!  This
> past Friday, I was scheduled off because of my
> daughter['s] wedding[.]  I failed to send [Siecko] an[]
> email telling him or asking him to be off.  I had only
> sent one request before, and it was with the help of my
> previous manager.  Yesterday [Siecko] called as I was
> about to leave[] and asked [Cain] and [me] to wait.  When
> he arrived, we went to the office, where he ended up
> terminating my employ[]ment!  This is nothing more than
> retaliation from the previous incidents that I had
> reported.  That is why I asked to be moved out of his
> district, as I knew this would happen[] due to the
> previous things he said to me.  I am requesting an
> investigation into this matter.  I would like Randy
> Bhetts to be invo[lv]ed[] or aware of these entire 2

---

[57]    See Doc. 50-13, Ex. 13 to Def.'s Mot. for Summ. J., Cain's Written
Statement Dated Sept. 8, 2015.

[58]    See id.

incidents.[59]

A few hours after receiving Plaintiff's email, Dalrymple forwarded the email to Myers, asking how he would like for her to proceed.[60]

Myers responded later that day in an email that stated:

[Plaintiff] was corrected several times regarding failure to comply with notifying his DM when tardy and absent. He was absent during his first couple of weeks with the company, back in December 2014, and he called his [manager Lucadou] only. A few days later his DM [Siecko] talked to him at the store and fully explained that he is required to call the DM anytime [he] would be absent, late, or schedule change [sic]. (no EE journal was done). On August 4, 2015[,] [Siecko] sat with [Plaintiff] to tell him about his transfer to [Store #] 91; [Siecko] also talked again to [Plaintiff] about calling him due to a couple of tardies he had in recent weeks, but[,] since the timing of this talk coincided with transferring him as a "fresh start" at [Store #] 91, [Siecko] told him he was not going to document this correction.

On Sept[.] 3rd[,] [Siecko] gave [Plaintiff] a written coaching for violation of policy, failure to notify for his Sept[.] 2 absence. He signed it, checked agreed, and wrote ". . . I agree with the phone policy of not calling him." This written coaching informed [Plaintiff] that further violation of policy "will" result in termination.

In [Plaintiff's] complaint today, he wrote[,] "I told my supervisor [Cain] that I had to leave." What he actually did on Sept[.] 2 is[,] at 9am, when he and [Cain] opened the store, he told her the needed to go sit in his truck because he was not feeling well. At 9:50am[,] [Cain] went out in the parking lot looking for [Plaintiff] and he was gone. [Cain] then contacted [Plaintiff], that is when he told her he was going home sick.

The text he sent [Siecko] that day was not seen by

---

[59]    Doc. 50-8, Ex. 8 to Def.'s Mot. for Summ. J., Email from Pl. to Dalrymple Dated Sept. 9, 2015.

[60]    Doc. 50-8, Ex. 8 to Def.'s Mot. for Summ. J., Email from Dalrymple to Myers Dated Sept. 9, 2015.

[Siecko] until he was clearing his phone that evening. And as [Plaintiff] knows, texting is not allowed as a means of notification.

[Plaintiff] stated today that he "failed to send [Siecko] an email . . . asking him to be off" for Sept[.] 4. Again, on Sept[.] 3[,] he was coached and documented that this would result in dismissal.

He stated that [the] previous vacation request he had sent in he had done "with the help of my previous manager." But[,] when I reviewed the request, [Plaintiff had] filled it out and signed it. He did so on 5-21-15 for the days June 8-11, 2015.

The consequences for [Plaintiff's] refusal to comply with policy that is spelled out to him in writing, would be the same regardless of who his DM is. To say the DM is retaliating is not a credible statement. The DM provided the consequences that he said he would.

On a sidenote, when [Plaintiff] was off work for more than 3 days in July 2015 and received the standard LOA letter[,] he wrote an email to you, accusing his [manager Lucadou of] falsifying a request? Harassing him? Asks i[f] he needs a lawyer? In my opinion[,] he is reacting in the same way to a situation he caused.[61]

On September 21, 2015, Plaintiff completed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") that was received by the agency on September 24, 2015.[62] Therein, Plaintiff complained of retaliation and stated: "I reported Lucadou to Corporate Headquarters because of numerous employee complaints that he was abusive. I believe my write-up and

---

[61] Doc. 50-8, Ex. 8 to Def.'s Mot. for Summ. J., Email from Myers to Dalrymple Dated Sept. 9, 2015.

[62] Doc. 50-17, Ex. 17 to Def.'s Mot. for Summ. J., Charge of Discrimination Dated Sept. 21, 2015. This EEOC charge is labeled "Amended" but no prior charge is in the record. See id.

discharge was motivated by that earlier complaint."[63]  Plaintiff did

not mention any discrimination against female employees; nor did he

state that he believed the retaliation was based on a report to

management about discrimination against female employees.[64]

In a separate Charge of Discrimination completed on October

15, 2015, and received by the EEOC on October 19, 2015, Plaintiff

complained of retaliation and stated:

> I began working at Hobby Lobby on December 22, 2014[,] as
> a Co-Manager.  My Manager[,] Glenn Lucadou, discriminated
> against the female employees working in our store.  He
> would frequently belittle them, call them in to [sic] his
> office for reprimands, and make them cry.  The female
> employees were constantly concerned that they are going
> to lose their jobs.  He even grabbed one female
> employee's head, shook it, and said[,] "[H]ello, is there
> anything in there?"  He also denied a female employee's
> vacation request solely because she was female.  Mr.
> Lucadou did not treat male employees this way.  I
> reported Mr. Lucadou's gender discrimination to HR in
> July of 2015, and he then treated me poorly as well, in
> retaliation for my complaint.  I was then fired on
> September 8, 2015.[65]

## 2.  Plaintiff's Testimony

Plaintiff's declaration[66] stated:

> 1.   I worked for Hobby Lobby Store #110 as a Co-Manager
>      for December of 2014 to September of 2015.  I was
>      transferred to Store #91 in August of 2015.
> 2.   During my time as a Co-Manager at Hobby Lobby, the

---

[63]    Id.

[64]    See id.

[65]    Doc. 50-17, Ex. 17 to Def.'s Mot. for Summ. J., Charge of
Discrimination Dated Oct. 15, 2015.

[66]    The declaration is identified as an affidavit but does not bear a
notary's signature or seal.  See Doc. 53-9, Ex. 9 to Pl.'s Resp., Pl.'s Decl.

company had a policy that require employees to contact their immediate supervisors if they were unexpectedly unable to come into work or if they needed to leave early. My immediate supervisor at Store #110 was Glenn Lucadou, and my immediate supervisor at Store #91 was Deborah Cain. When I worked at Store #110 and Store #91 and when I would be unexpectedly absent or have to leave the store during my shift, I contacted Glenn Lucadou and Deborah Cain. I did this at least 3 times and there was never an issue.

3. I assumed that this absence policy requiring me to contact my Store Manager, Glenn Lucadou, was all that I was expected to do because I observed that other Store #110 employees like Tanrance [sic] Moshay and Claudine Marshall, contacted Glenn Lucadou when they were unexpectedly absent or had to leave work early and there were no issues.

4. I was not aware that I was required to contact the District Manager, Lynn Siecko, if I was unexpectedly absent or had to leave early until Lynn Siecko wrote me up on September 3, 2015. Lynn Siecko told me in a casual conversation that I should notify him if I was ever unexpectedly absent or late. From this casual conversation, he did not tell me that I was supposed to notify him by calling him on the phone[] and that texting or email wasn't acceptable[] or that I was supposed to contact him in the way that I contacted Glenn Lucadou or Debbie Cain pursuant to company policy. He did not tell me I had to call him for permission in that conversation. Hobby Lobby also has a vacation policy that requires management approval of vacation requests. When I submitted my first vacation request on May 21, 2015[,] Glenn Lucadou told me to give it to him and he would take care of it. I gave my vacation request with my signature to Glenn Lucadou in-person at Store #110, and he told me later that he took care of it and it was approved.

5. In February 2015 when Glenn Lucadou tried to write me up using the Employee Journal for "failing to zone[]" and for not providing a Checker's Test that Lynn Siecko was late in generating, I was not belligerent, and I did not walk away from him while he was talking to me. I told [Lucadou] that I would see him tomorrow after I told him that I would not sign the write-up, and he said, "ok."

6.  When Lynn Siecko wrote me up on May 26, 2015[,] after walking the store with Glenn Lucadou, he said that "the store didn't look bad, but it didn't look as good as it should." I did not sign the write-up, and he didn't give me a chance to actually read it. He just wanted me to sign it.

7.  Based on Glenn Lucadou's conduct that I witnessed, particularly toward the female employees, I called Hobby Lobby's Human Resources on July 2, 2015[,] and told Kelly [Dalrymple] everything that Glenn Lucadou had done to me and the female employees. At the end of the phone call, she asked me to send her a written statement. My first email to Human Resources was sent by me on July 2, 2016[,] after I spoke with Kelly [Dalrymple] earlier that afternoon where I explained what Glenn Lucadou had done to me and how the female employees would cry after leaving his office. I sent a follow-up email on July 5, 2016[,] giving her one particular instance of harassment where [Lucadou] grabbed Jennifer Herring's head, shook her, and then asked "Is there anything going on in there?" I never heard of or saw Glenn Lucadou do these outrageous things to male employees. I sent the same July 5 email to [Dalrymple] again on July 10 to make sure that she received it.

8.  Based on the training I received from Human Resources and the fact that I never saw [Lucadou] grab or treat male employees the way he treated female employees, I believed that [Lucadou's] conduct was discriminatory, when I complained about it to Kelly [Dalrymple] on July 2, 2017.

9.  When Jeff Myers and his assistant met with me after they interviewed everyone in July 2015, Jeff Myers told me at the beginning of the meeting that "it was a standard practice to investigate the person who files a complaint with Human Resources." . . . Myers never asked me about any of the things I reported, witnessed or heard about [Lucadou's] treatment toward female employees. Instead, [Myers] wrote me up for rumors from the other employees and Glenn Lucadou that I cursed. Toward the end of the meeting where Jeff Myers wrote me up, he mentioned in passing that he would talk to [Lucadou] because the thing I said about [Lucadou's] harassing women was true, but he tried to keep my complaint as gender-neutral as possible when he talked about it, and he wrote me up solely

because I called HR about Glenn Lucadou.

10. On August 4, 2015[,] when Siecko met with me about transferring to Store #91, he told me that I was late coming between July 18 and August 1. That is simply not true. I came to work according to my scheduled time and before the store opened, but Lynn Siecko said I was late because I didn't get there even earlier. When I transferred to Store #91, I asked for a day of vacation time around the first week of August of 2015. My store manager, Debbie Cain, approved my vacation day to be September 4, 2015. Debbie Cain approved this date back around the first week of August[] 2015. Debbie Cain put the date that I would be off on the employee calendar for anyone, including Lynn Siecko, to see. This calendar was displayed three to four weeks before September 4, 2015.

11. On September 2, 2015, I got sick and told Debbie Cain in person that I was going to lay [sic] down in my truck. I texted [Siecko] because my throat swelled up, and I couldn't talk to him on the phone. I felt so bad that day I eventually left.

12. Lynn Siecko fired me for my complaint against Lucadou and pretended it was because I didn't call him to get his approval for vacation even though I already got approval from my Store Manager. He tried to say that I didn't follow the policy that he told me about days before, even though he knew that was just unexpected absences and calling in sick. He just wanted an excuse to retaliate against me for reporting Glenn Lucadou's conduct in July[] 2015.[67]

In his deposition, Plaintiff agreed that, when he first started working for Defendant, Siecko had informed Plaintiff to "be sure to just give [Siecko] a call if [Plaintiff was] going to be late or [could not] make it in" but characterized it as a statement made while Plaintiff, Siecko, and Lucadou were "standing together

---

[67] Id.

and nonchalantly talking."[68]  Plaintiff maintained that Siecko's instruction to call him was not a policy, that he never signed anything indicating it was a policy, and that he did not understand "the entire procedure" as it related to vacation requests.[69] Nevertheless, Plaintiff admitted that he complied with Siecko's instruction when Plaintiff called in sick on July 8, 2015, and when he left early on September 1, 2015, and that Siecko had approved a vacation request earlier in the year.[70]

Plaintiff testified that, when Lucadou returned from being ill in February 2015, Lucadou wrote up Plaintiff "for the way the store looked."[71]  Plaintiff described the encounter as follows:

> [H]e told me basically he didn't like the way the store looked.  And I said, . . . You know I had the flu.  I couldn't function.
> And then it was, ["]Well, you should have called me and stuff.  I'm writing you up.["]
> And I said, ["]Well, I'm not going to sign it.["]
> And he goes, ["]You're not going to sign it?["]
> I said, ["]No, sir.["]
> And he goes, ["]Well okay.["]
> And then he grabbed it, and I guess . . . he was putting it in his file.  And I said, ["]Okay. Well, I'll see you tomorrow.["]  And I got up[;] he didn't say anything, and I walked out, left, got . . . a text, called him when I got home.  He asked if I was coming in, and I said, ["]I told you I was coming in.["]  I go, ["]Well, why?["] He goes, ["]I don't know.  I thought you

---

[68]     Doc. 50-1, Ex. 1 to Def.'s Mot. for Summ. J., Pl.'s Dep. pp. 31, 167.

[69]     See id. pp. 37, 167.

[70]     See id. pp. 14, 37, 167-68.

[71]     Id. p. 86.

might be mad."[72]

Plaintiff admitted that Lucadou treated Plaintiff poorly even before he reported Lucadou to HR but complained that after he contacted HR, Lucadou "started to write [Plaintiff] up, started -- I mean, you know, you name it, lie about me to Lynn Siecko."[73]

Plaintiff testified that the store had as many as forty employees, seventy-five to ninety percent of whom were women.[74] Plaintiff identified three women whom he saw crying after meeting with Lucadou in his office.[75] Plaintiff stated that he "tried to talk to a couple of them," but "[t]hey didn't want to talk about it."[76] Plaintiff reported that one of them said that Lucadou told her "that maybe she doesn't need to be a department manager or working in the -- or full-time or something to that effect," "that he had referred to her as a hard-headed, northern girl," and that "he said something about her sweating and -- body cleanliness or something to that effect."[77] Plaintiff told her that she should talk to HR.[78]

Another female employee told Plaintiff that Lucadou was "an

---

[72]  Id. p. 87.

[73]  See id. p. 179.

[74]  See id. pp. 123-24.

[75]  See id. pp. 121-22.

[76]  Id. p. 122.

[77]  Id. pp. 122, 154.

[78]  See id. p. 154.

asshole."[79]  According to Plaintiff, the third woman said that she did not want to "tell anybody or do anything because she has a family and needs the job."[80]  Plaintiff admitted that, while he was experiencing anxiety and depression in July 2015, he also "did tear up" at work but "would walk away on the sales floor."[81]  Plaintiff testified that he asked the woman whose head Lucadou grabbed and shook if she wanted go to HR.[82]  Plaintiff testified that she said she did not want to go because "she needed her job" and told Plaintiff that she had to talk her husband out of going to the store to "beat the crap out of [Lucadou]."[83]  Plaintiff said that he felt it was his duty, as a member of management, to report these incidents to HR.[84]

Plaintiff also reported that the stock men made comments, such as, "[H]e's an asshole[;] I'm not going to do that[;] what is he thinking[;] I'm not going to do what he says[;] I'm getting out of here."[85]  He said that "they would just only really talk about [Lucadou] when they were, you know, asked to do something . . . that they thought was silly and didn't make sense, or he was

---

[79]    Id. p. 122.

[80]    Id. p. 123.

[81]    Id. p. 139.

[82]    See id. p. 154.

[83]    Id. p. 158.

[84]    See id.

[85]    Id. p. 124.

getting on to them for being slow when they were only one person taking out furniture and trying to move aisles."[86]

When asked to point out portions of his emails to HR that were reports of sexual harassment or gender discrimination, Plaintiff stated:

> Well, first, the reason I reported to HR is so they can investigate it. And[,] that being said, him taking female associates behind closed doors and having them tell me after they're crying that he threatened their job, that was one reason.
> The second one is when you grab an associate's head and you shake it and you ask if anything's in there and you still work for the company, there's a serious problem going on in that company and it needs to be addressed.[87]

When pressed about what was based on sex or gender, Plaintiff said, "I was taught at Walgreens many, many times by HR you never take a female associate into a room behind closed doors by yourself . . . because it leads to self-incrimination."[88]  Plaintiff continued, "[T]hat's what [Lucadou] did so nobody could hear as he harassed them and threatened their jobs.  Some even said so.  And you have statements from some that have said so."[89]  Plaintiff said that he never saw Lucadou "grab any guys and do anything like that."[90]  He conceded that Lucadou would try to intimidate both the "guys" and

---

[86]    Id. p. 125.

[87]    Id. pp. 160-61.

[88]    Id. p. 162.

[89]    Id.

[90]    Id.

the "girls" and "thought he could do pretty much what he wanted to, and he did."[91]

Plaintiff agreed that he "occasionally said a cuss word" but not that he went "around cussing every day, all the time."[92]  He said that he did not recall using "the F word at work."[93]

When questioned about his initial EEOC complaint, Plaintiff admitted that he did not indicate the employee complaints raised "sex harassment" but only that he reported Lucadou because of numerous employee complaints, from men and women, that he was abusive.[94]

**B.  Procedural History**

On October 19, 2015, Plaintiff filed an amended charge of discrimination with the EEOC.[95]  The EEOC issued a Notice of Right to Sue on February 25, 2016.[96]

On May 5, 2015, Plaintiff filed this action against Defendant, complaining that he was terminated on the basis of retaliation in violation of Title VII.[97]  On July 25, 2016, Defendant responded,

---

[91]  Id.

[92]  Id. p. 155.

[93]  Id.

[94]  Id. pp. 177-78.

[95]  See Doc. 1, Pl.'s Compl. p. 3.

[96]  See id.

[97]  See Doc. 1, Pl.'s Compl.

raising numerous defenses.[98]   On June 5, 2017, the parties unsuccessfully attempted mediation.[99]

On July 10, 2018, Defendant timely filed the pending motion for summary judgment.[100]  Plaintiff responded on August 19, 2017.[101] The court now addresses the motion.

## II.  Legal Standard for Summary Judgment

Summary judgment is warranted when the evidence reveals that no genuine dispute exists on any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Stauffer v. Gearhart, 741 F.3d 574, 581 (5th Cir. 2014).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  See Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013)(quoting Anderson, 477 U.S. at 248).

The movant must inform the court of the basis for the summary

---

[98]   See Doc. 8, Def.'s Ans.

[99]   See Doc. 42, Mediator's Report.

[100]   See Doc. 50, Def.'s Mot. for Summ. J.

[101]   See Doc. 53, Pl.'s Resp. to Def.'s Mot. for Summ. J.

judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. <u>Celotex Corp.</u>, 477 U.S. at 323; <u>Topalian v. Ehrman</u>, 954 F.2d 1125, 1131 (1992). If the moving party carries its burden, the nonmovant may not rest on the allegations or denials in his pleading but must respond with evidence showing a genuine factual dispute. <u>Stauffer</u>, 741 F.3d at 581 (citing <u>Hathaway v. Bazany</u>, 507 F.3d 312, 319 (5th Cir. 2007)).

### III. Legal Standard for Retaliation

Pursuant to 42 U.S.C. § 2000e-3a, Title VII's anti-retaliation provision:

> It shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

The two clauses of 42 U.S.C. § 2000e-3a are known as the opposition clause and the participation clause. <u>See</u> <u>E.E.O.C. v. Rite Way Serv., Inc.</u>, 819 F.3d 235, 239 (5th Cir. 2016). Plaintiff's claim of retaliation fits within the opposition clause.

In the absence of direct evidence, courts analyze retaliation claims under the burden-shifting approach first articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Davis v. Fort Bend Cty.</u>, 765 F.3d 480, 489-90 (5th Cir. 2014). On summary

judgment, a plaintiff first must produce evidence in support of each element of a prima-facie case.  Id.  If the plaintiff is successful, the defendant must "state a legitimate, non-retaliatory reason for its decision."  Id. at 490.  Upon the defendant's demonstration of a legitimate reason, the burden returns to the plaintiff to show that the defendant's reason is "actually a pretext for retaliation."  Id.  The prima-facie elements of a retaliation claim are:  "(1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between the protected activity and the adverse employment action." Fisher v. Lufkin Indus., 847 F.3d 752, 757 (5th Cir. 2017).

## IV.  Discussion

Defendant seeks summary judgment in its favor based on the arguments that Plaintiff failed to produce evidence in support of the first (protected activity) and third (causal connection) elements of a retaliation claim and that he failed to produce evidence that Defendant's stated reasons for terminating Plaintiff were false and were, in fact, pretext for retaliation.

## A.  Protected Activity

In the case of retaliation based on the opposition clause, making complaints to HR qualifies as protected activity only if the plaintiff shows that he reasonably believed the employment practices that he opposed to be unlawful.  See Equal Emp't

Opportunity Comm'n v. EmCare, Inc., 857 F.3d 678, 683 (5th Cir. 2017); Rite Way Serv., Inc., 819 F.3d at 240-41. "Magic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." Brown v. United Parcel Serv., Inc., 406 F. App'x 837, 840 (5th Cir. 2010)(unpublished)(collecting cases); see also Rite Way Serv., Inc., 819 F.3d at 242-43 (stating that complained-of conduct may constitute protected activity even if it falls short of an actual Title VII violation but only if a reasonable person could have believed that it violated the law).

Here, Plaintiff alleged that he reported gender discrimination and sexual harassment. The elements of a gender-discrimination claim as applicable to this case are that the employee is within a protected class, was qualified for the position, and suffered an adverse employment decision, such as hiring, firing, demoting, promoting, granting leave, and compensating, and that "others similarly situated but outside the protected class were treated more favorably." Alvarado v. Tex. Rangers, 492 F.3d 605, 611 (5th Cir. 2007)(listing elements of a discrimination claim); see also Thompson v. City of Waco, Tex., 764 F.3d 500, 503 (5th Cir. 2014)(defining adverse employment action for Title VII discrimination claims). The elements of a sexual-harassment claim are that an employee within a protected class was subject to unwelcome sexual harassment that was based on sex and "affected a

33

term, condition, or privilege of employment." <u>Seibert v. Jackson Cty., Miss.</u>, 851 F.3d 430, 437 (5th Cir. 2017)(internal quotation marks omitted)(quoting <u>Lauderdale v. Tex. Dep't of Criminal Justice, Institutional Div.</u>, 512 F.3d 157, 163 (5th Cir. 2007)).

Defendant's policies against discrimination and harassment prohibit an even broader range of conduct, including "comments or actions that are inappropriate for the workplace, disrupt and/or interfere with work performance[] or negatively or stereotypically relate to an employee's . . . gender" and "inappropriate sexual conduct[,] which is a form of inappropriate conduct and includes unwelcome sexual advances, requests for sexual favors, and other verbal, physical conduct of a sexual nature."[102]

The court first addresses whether a reasonable person could have believed that the reported conduct violated Title VII and whether Plaintiff thus put Defendant on notice of the possibility of unlawful conduct. Then the court considers whether the evidence indicates that Plaintiff subjectively believed Lucadou's conduct violated Title VII.

The vast majority of Plaintiff's telephone and email communications with HR involved general complaints about *his* working conditions, which do not implicate any unlawful conduct on Defendant's part. As a small sample of the complaints Plaintiff raised concerning his treatment, Plaintiff reported that Lucadou

---

[102]    Doc. 50-5, Ex. 5 to Def.'s Mot. for Summ. J., Emp. Handbook p. 28.

34

called Plaintiff slow, that Lucadou never provided Plaintiff with specific assignments, that Lucadou sat in his office most of time, that Lucadou was rude and sarcastic, that Lucadou wrote up Plaintiff for store appearance, that Lucadou relayed untrue information to Siecko about Plaintiff, that Siecko said Plaintiff may be lazy, that Siecko wrote up Plaintiff for store appearance, that Lucadou caused division among store employees, that Lucadou asked associates about Plaintiff's private life, and that Lucadou required Plaintiff to report early and required him to stay until all projects were completed. Obviously, none of these complaints rise to the level of protected activity. Cf. Davis, 765 F.3d at 490 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006))(internal quotation marks omitted)("Title VII does not set forth a general civility code for the American workplace."); Lauderdale, 512 F.3d at 163 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)(internal quotation marks omitted)("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.") Plaintiff makes no argument that he reasonably believed that Lucadou's actions against him were unlawful.

One paragraph of the email, which addressed Lucadou's divisiveness, included the sentences: "I have seen [Lucadou] take many of our female associates into the office and shut the door.

Only to see them come out later crying [sic]."[103]    In his supplemental email, Plaintiff stated that one female associate told Plaintiff that she was upset because Lucadou denied her requested vacation dates, forcing the cancellation of reservations, due to the proximity to another employee's vacation.   The employee told Plaintiff that Lucadou was "always belittling her," that "she felt like her job was being threatened," and that Lucadou "grabbed her head and shook it" while asking if there was "anything in there."[104] Plaintiff argues that these were reports of gender discrimination and sexual harassment and that Plaintiff believed that Lucadou was engaged in unlawful conduct.

These few sentences amid the long list of complaints about Lucadou's treatment of Plaintiff do not stand out as reports of gender discrimination or sexual harassment.   Certainly, Plaintiff did not use those terms, but, even more importantly, the only difference between these accounts and the remainder of the emails was that he identified the gender of the employees.  By Plaintiff's own account, the vast majority of employees at Store #110 was female.   Much of the emails discuss Lucadou's wide range of harsh supervisory communications as applying equally to male and female employees.    The emails focus on how harshly Lucadou treated

<hr />

[103]    Doc. 50-8, Ex. 8 to Def.'s Mot. for Summ. J., Email from Pl. to Dalrymple Dated July 2, 2015.

[104]    Doc. 50-8, Ex. 8 to Def.'s Mot. for Summ. J., Email from Pl. to Dalrymple Dated July 10, 2015.

Plaintiff; the treatment was so harsh, in fact, that Plaintiff was moved to request a transfer to another store.

The Fifth Circuit faced facts analogous to this case in Brown, 406 F. App'x at 838, 840, where the plaintiff filed multiple grievances complaining about "unfair work distribution, unpaid overtime, and selective enforcement of a lunch policy" and stated that he felt "discriminated upon" without complaining about discrimination that was based on any protected category. The Fifth Circuit found that the plaintiff failed to establish that he engaged in a protected activity because his complaints, "without more, are not prohibited by Title VII." Id. at 840.

Nothing in the emails suggested that Lucadou acted harshly against the women employees based on or because of gender. Nothing suggested they received less favorable treatment because of sex. Although Plaintiff did not report that Lucadou made any male employees cry, Plaintiff did describe incidents in which he, himself, felt Lucadou was rude and sarcastic to him and unfairly disciplined him.

Nothing in the emails indicated that any employee experienced an interaction with Lucadou of a severe and pervasive nature. Lucadou's physical act of grabbing the head of an employee while asking if there was anything in there was a particularly aggressive form of rudeness and sarcasm, one that appears to have violated Defendant's policy against inappropriate comments or actions.

However, this isolated incident did not rise to the level of an adverse employment action[105] nor did it affect a term or condition of employment.

In Clark County School District v. Breeden, 532 U.S. 268, 269, 271 (2001), the Supreme Court found that no reasonable person could have believed that reading and chuckling about a sexually explicit comment found in an applicant's folder in the presence of a female coworker violated Title VII.  Similarly, in Satterwhite v. City of Houston, 602 F. App'x 585, 586, 588 (5th Cir. 2015)(unpublished), the Fifth Circuit found complaining that a coworker had said "Heil Hitler" in a work meeting would not lead a reasonable person to believe that Title VII was violated.

The court finds that Plaintiff failed to report conduct that a reasonable person could find violated Title VII.[106]  This conclusion is buttressed by Plaintiff's contemporaneous words and actions, which belie any subjective belief that the actions he reported were unlawful under Title VII.  For example, Plaintiff followed the report about Lucadou's physical contact with the female employee by stating that "[a] lot of employees in our store have felt threatened by [Lucadou].  I am speaking up for them, as

---

[105]    The court acknowledges that denial of leave may qualify as an adverse employment action; however, Plaintiff's report to HR indicated that Lucadou merely denied the dates this employee requested as too close to another employee's scheduled leave.  Neither Plaintiff's account nor any other evidence remotely suggests that Lucadou denied the employee's right to take leave.

[106]    Even if the court were to conclude otherwise, Plaintiff's claim would fail for other reasons discussed in the remainder of this opinion.

they are afraid to."[107]   Plaintiff thereby suggested that he was
speaking on behalf of employees of both genders.   Additionally,
when Plaintiff emailed Dalrymple to challenge his termination, he
explained his absences in early September and his communication
with Cain and Siecko, concluding that his termination was "nothing
more than retaliation from the previous incidents that I had
reported."[108]   In the next sentence, he said, "That is why I asked
to be moved out of [Siecko's] district, as I knew this would
happen[] due to the previous things he said to me."[109]   Plaintiff
conveyed no belief that he experienced retaliation because he
reported Title VII violations.   Even more indicative of Plaintiff's
lack of subjective belief was his first EEOC complaint filed
shortly after his termination, which was completely silent on the
issue.   Therein, he indicated that he had been retaliated against
solely because he reported many employee complaints against
Lucadou.

    It was not until Plaintiff's second EEOC complaint that he
employed the language of Title VII.[110]   Plaintiff's testimony in

---

[107]    Doc. 50-8, Ex. 8 to Def.'s Mot. for Summ. J., Email from Pl. to
Dalrymple Dated July 10, 2015.

[108]    Doc. 50-8, Ex. 8 to Def.'s Mot. for Summ. J., Email from Pl. to
Dalrymple Dated Sept. 9, 2015.

[109]    Id.

[110]    See Doc. 50-17, Ex. 17 to Def.'s Mot. for Summ. J., Charge of
Discrimination Dated Oct. 15, 2015 (stating, for example, that "Lucadou[]
discriminated against the female employees," that the "female employees were
constantly concerned" about losing their jobs, and that Lucadou treated male
employees differently).

this case included embellished, self-serving, and revisionist statements;[111] for example: he implied that he told Dalrymple that he never observed Lucadou doing such outrageous things to male employees; he declared that Myers told Plaintiff after the investigation that Plaintiff's reports about Lucadou's harassing women was true; he added details that were not reported to HR (including that he told certain female employees that they should contact HR); he speculated that Lucadou was harassing the female employees and threatening their jobs behind closed doors;[112] and he testified that he felt it was his duty, as a member of management, to report the incidents to HR.

Overall, the court finds that Plaintiff's report would not lead a reasonable person to believe that Lucadou engaged in unlawful conduct or that it put Defendant on notice that Plaintiff believed he did. Without evidence of these requirements, Plaintiff cannot meet the protected-activity element, regardless of any potential conflict between what Plaintiff's subject belief appeared to be prior to his second EEOC complaint and what he professed thereafter. Even though the court finds that Plaintiff failed to

---

[111] The Fifth Circuit does not recognize self-serving allegations as "the type of significant probative evidence required to defeat summary judgment." United States v. Lawrence, 276 F.3d 193, 197 (5th Cir. 2001)(internal quotation marks omitted)(quoting Munitrad Sys., Inc. v. Standard & Poor's Corp., 672 F.2d 436, 440 (5th Cir. 1982)).

[112] Plaintiff could not have reasonably believed that the act of counseling a female associate behind closed doors ipso facto meant that Lucadou was engaging in conduct prohibited by Title VII.

meet his burden on the first element of a retaliation claim, the court continues its analysis with the second element (adverse employment action).

## B.  Adverse Employment Action

To establish that the plaintiff suffered an adverse employment action, he "must show that 'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Davis, 765 F.3d at 490 (quoting White, 548 U.S. at 68).  "This materiality requirement separates 'significant from trivial harms.'"  Id. (quoting White, 548 U.S. at 68).  "Importantly, the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters."  Id. (internal quotation marks omitted)(quoting White, 548 U.S. at 69).

Defendant concedes that Plaintiff suffered an adverse employment action in the form of termination, but Plaintiff also argues that the corrective actions taken after his report to HR, as well as Myer's statement that it was standard policy to investigate the person who initiated the investigation, were acts of retaliation.[113]  In context, these acts were not significant enough

---

[113]    Plaintiff was transferred at his request after the investigation; however, he was not transferred out of Siecko's district as he had wished.  To the extent that Plaintiff argues that the transfer was an adverse employment action because it was not exactly what he sought, the Fifth Circuit previously held that a transfer is not a materially adverse employment action if it is lateral.  See Sabzevari v. Reliable Life Ins. Co., 264 F. App'x 392, 396 (5th

to rise to the level of adverse employment actions. Plaintiff produced no evidence of how these particular acts, individually or collectively, were materially adverse. Plaintiff produced no evidence that the disciplinary actions or the investigation changed his standing with the other employees, made his job more difficult, or had any other adverse impact on him. See Davis, 765 F.3d at 491 (identifying examples of materially adverse consequences). The court finds that Plaintiff failed to demonstrate that these pre-termination acts were materially adverse. The court continues its analysis based only on Plaintiff's termination.

## C.  Causation

The third element of a prima-facie case, causal connection, requires that the "protected activity was a but-for cause of the alleged adverse action by the employer." Fisher, 847 F.3d at 757 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013)). In adopting the but-for causation standard, the Supreme Court explained that it requires a showing "that the causal link between injury and wrong is so close that the injury would not have occurred but for the act." Nassar, 570 U.S. at 343. That is to say, "the desire to retaliate was the but-for cause of the challenged employment action." Id. at 352.

One district court poignantly described the degree of causal connection required, stating, "[E]ven if a plaintiff's protected

---

Cir. 2008)(unpublished).

conduct is a *substantial* element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." <u>Minor v. Alcatel USA Res., Inc.</u>, No. 4:05CV339, 2007 WL 1342536, *9 (E.D. Tex. May 1, 2007)(unpublished)(emphasis added)(citing <u>Jack v. Texaco Research Ctr.</u>, 743 F.2d 1129, 1131 (5th Cir. 1984)). The Supreme Court explained, by way of hypothetical, that the lessened causation standard of discrimination cases could contribute to the filing of frivolous retaliation claims:

> Consider in this regard the case of an employee who knows that he or she is about to be fired for poor performance, given a lower pay grade, or even just transferred to a different assignment or location. To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation.

<u>Nassar</u>, 570 U.S. at 358. The court noted that "the lessened causation standard would make it far more difficult to dismiss dubious claims at the summary judgment stage." <u>Id.</u>

The court's focus is on the final decisionmaker, which was Siecko. <u>See</u> <u>Royal v. CCC & R Tres Arboles, L.L.C.</u>, 736 F.3d 396, 404 (5th Cir. 2013). One of Plaintiff's theories of causation is that "Lucadou's retaliatory animus caused Siecko to develop a retaliatory animus, which resulted in [Plaintiff's] termination for

pretextual reasons."[114]  Plaintiff's burden under that theory is to show that Siecko was influenced by someone with a retaliatory motive to terminate Plaintiff.  Zamora v. City of Houston, 798 F.3d 326, 331 (5th Cir. 2015); see also Fisher, 847 F.3d at 757-58.

Plaintiff fails in this effort for two reasons.  First, Plaintiff simply assumes Lucadou harbored retaliatory animus because Plaintiff filed a report against Lucadou.  Plaintiff points to no evidence that Lucadou made comments or took actions revealing that animus.  Second, Plaintiff's only evidence of influence is neither competent nor material.  Plaintiff relies on a rumor that Lucadou and Siecko were friends and on his own speculation that Lucadou told Siecko lies about Plaintiff.  Moreover, in his response, Plaintiff argues that he was targeted by Myers in the investigation and thereafter was counseled by Myers for conduct uncovered in the interviews.  Plaintiff fails to demonstrate that Lucadou (or Myers, for that matter) influenced Siecko, pointing only on the timing of his termination in relation to the investigation as proof.

The Fifth Circuit has long held that, under but-for causation, evidence of more than timing is required to survive summary judgment.  See Strong v. Univ. Healthcare Sys., L.L.C., 482 F.3d 802, 808 (5th Cir. 2007)(citing cases).  Plaintiff produced no evidence of retaliatory animus such as negative comments made to

---

[114]    Doc. 53, Pl.'s Resp. p. 30.

him or others about Plaintiff's complaints to HR. More importantly, Plaintiff's disciplinary history began well before he made a report to HR, and, ultimately, he was terminated for not following instructions given to him early in his tenure with Defendant.

Therefore, Plaintiff also fails to meet his summary judgment burden as to this element of the prima-facie case. Even if Plaintiff were able to produce evidence of every prima-facie element, Defendant asserted a legitimate non-retaliatory reason for terminating Plaintiff. Plaintiff was counseled on multiple issues and warned more than once that any other violation of policy could result in Plaintiff's termination.

**D. Pretext**

Plaintiff contends that Defendant's reason was a pretext for retaliation. One of Plaintiff's theories is that the policy violation for which he was fired was not a written policy, thus indicating that the reason for termination was false. He contends that the written policy, which stated he was to report to his supervisor, directed that he contact Lucadou. Lucadou, Siecko, and Myers all counseled Plaintiff, and all signed counseling forms as Plaintiff's supervisor. Arguably, the facts are in dispute as to who was Plaintiff's supervisor. However, the dispute is not material. Even if Lucadou was the person, under the written policy, whom Plaintiff was to contact in case of absence, Plaintiff

had been instructed to contact Siecko.  Whether Siecko's policy was written or unwritten does not refute the evidence that Siecko verbally provided Plaintiff instructions, which he had complied with on more than one occasion and had acknowledged on a counseling form.

Plaintiff mentions two assistant managers whom he contends were not disciplined for failing to notify Siecko of absences.  To the extent that Plaintiff seeks to prove pretext by pointing to similarly situated individuals who were treated more favorably than he under nearly identical circumstances, Plaintiff fails to demonstrate either that they were similarly situated or that the circumstances were nearly identical.  See Morris v. Town of Indep., 827 F.3d 396, 401 (5th Cir. 2016)(defining the "similarly situated" requirement in a race-discrimination case); Agoh v. Hyatt Corp., 992 F. Supp.2d 772, 736-37 (S.D. Tex. 2014)(discussing "similarly situated" requirement at pretext stage of a race- and age-discrimination case).  An assistant manager is not in the same role as a co-manager, and Plaintiff fails to cite any evidence that they were similarly situated.  Plaintiff also fails to produce any evidence the circumstances were nearly identical and, in fact, is able only to speculate about the other employee's precise circumstances, such as whom they actually called.[115]  He produces no

---

[115]    See Doc. 50-1, Ex. 1 to Def.'s Mot. for Summ. J., Pl.'s Dep. pp. 174-75.

evidence that Siecko instructed them to contact him directly about absences.

Plaintiff therefore fails to produce any evidence of pretext. As Plaintiff was unable to meet his summary judgment burden on two of three prima-facie elements, as well as pretext, summary judgment should be granted on Plaintiff's retaliation claim and, consequently, his entire lawsuit.

## IV.   Conclusion

Based on the foregoing, the court **GRANTS** Defendant's motion.

**SIGNED** in Houston, Texas, this 30<u>th</u> day of March, 2018.

_____
U.S. MAGISTRATE JUDGE